## J. T. SWEARINGEN GARNISHEE, v. WM. HENDLEY & Co.

(Case No. 3730.)

1. STATUTE OF FRAUDS — ASSIGNMENT FOR BENEFIT OF CREDITORS.— A debtor, though in failing circumstances, has the right, in making an assignment of his property for the benefit of his creditors, to prefer creditors, if done *bona fide;* and if the purpose is to pay honest debts, either by a general distribution, or by expressing a preference among his creditors, it will be valid. Baldwin *v.* Peet, 22 Tex., 717.

2. SAME.— Reserving trifling amounts by a debtor in making an assignment is no indication of fraud, and that most of the claims assigned are worthless is no objection to the assignment, when it appears they were all he had.

3. No acceptance by creditors necessary.—Where the deed imposes no terms upon the creditors, the law presumes the acceptance by the creditors of an assignment for their benefit.  32 Tex., 708.

4. Same — Limitation.— A debtor is not bound to plead the statute of limitation, and it is no objection to a deed of assignment that a debt barred by limitation is included in the list of his liabilities, or that some of his debts were due his kinsman.

5. Individual debts.— The individual debts of a debtor making an assignment have no preference over those owing by him as a member of a partnership.  Higgins v. Rector, 47 Tex., 361.

6. Setting aside deed of assignment.— It is error to set aside a deed of assignment and still require the assignee to administer the debtor's estate for the benefit of the creditor attacking the assignment.

7. New trial.— A defendant will not be given a new trial to make parties, where he has failed to ask that relief, or make any objection on that ground until after the cause has been tried.

Appeal from Washington.   Tried below before the Hon. E. B. Turner.

Hendley & Co. brought suit against P. M. Daniel in the district court of Washington, on 23d October, 1876, on an account due them, and one due Cannon & Williams, assigned to them.

On 23d November 1876, a writ of garnishment was sued out against J. T. Swearingen.

Judgment by default was rendered in favor of Hendley & Co. against Daniel for $1,802.64, 4th August, 1877.

On 6th January, 1877, Swearingen answered the writ of garnishment, stating that on the 10th August, 1876, the defendant Daniel executed to him a deed of assignment of his notes, accounts and other effects, with authority to collect the same, and, after paying all reasonable and proper charges, to pay Daniel's creditors the full amount due them, and in case the proceeds were insufficient to pay the debts in full, then to pay the creditors *pro rata*, in proportion to the amount due each.   The deed of assignment, together with a list of the debts due Daniel, amounting to the sum of $6,008.26, and of the names of his creditors, with the amount due each, including the claims upon which this suit was brought, amounting in the aggregate to $10,809.96, was attached to his answer.

It was further alleged in Swearingen's answer that the assignment was made in good faith, included all of the assets belonging to Daniel, and gave a correct list of his liabilities, and that he had accepted the same and undertook its obligations in good faith. At the date of his answer, he had collected $1,572.62, which he was ready to distribute in accordance with the terms of the deed of assignment.

On 20th January, 1877, Hendley & Co. filed an affidavit controverting the truth of Swearingen's answer, and charging that this assignment was made with intent to hinder and delay and defeat creditors, and is, therefore, null and void. It is specially charged:

1. That at the time of making this assignment, Daniel was notoriously insolvent.

2. That on 29th July, 1876, Daniel, then a retail merchant in Brenham, sold his stock of goods to Hodde & Werner, secretly, for an inadequate consideration, to prevent creditors from attaching them.

3. That he has secreted the proceeds of the sale and reserved it for his private use.

4. That he preferred creditors, paying Basset & Basset fraudulently.

5. That Swearingen was Daniel's attorney, and that the assignment was made to him and accepted by him, knowing its fraudulent character, and aiding and abetting Daniel in the same.

6. That the assignment has never been accepted by the pretended beneficiaries.

7. That half the notes and claims recited in the schedule as transferred to Swearingen were fictitious, barred by limitation, and uncollectible.

8. That he reserved his most valuable claims for his private use.

9. That the schedule of his creditors is false. That at least half of the claims enumerated are not valid debts. That some of them are debts due by Daniel as a member of the partnership, and not to be classed with his individual debts.

10. That Daniel had not delivered his books and papers to the assignee.

To these allegations the garnishee replied, denying them so far as inconsistent with his answer, etc.

The case was submitted to the judge, who rendered judgment against the garnishee in favor of Hendley & Co. for the money in his hands, declaring the assignment null and void, and enjoining Swearingen from transferring the notes and effects in his hands, but that he hold the same in trust for Hendley & Co., who are declared to be Daniel's only creditors; that he collect them and pay the proceeds over to them until their judgment is fully satisfied.

Swearingen filed a motion for a new trial, which being overruled, he appealed.

There are several assignments of error, but the appellant relies principally upon these — that the judgment is against the evidence, and that the proper parties were not made.

*Sayles & Bassett,* for appellant.

*Shepard & Garrett* and *T. W. Morris,* for appellees.

QUINAN, J.— Upon the trial it appeared in testimony: Daniel was a retail merchant in Brenham. Previous to the year 1874 he had been in business with one C. M. Daniel, at the same stand. C. M. Daniel died that year, and P. M. Daniel bought out his interest in the concern from his widow and continued the business. In 1876 his health failed. He was afflicted with asthma, and unable for weeks to attend at his store. He was unsuccessful in business. It is admitted that he was then in failing circumstances. He determined to close up his business and leave Brenham. He swears that he was induced to this by his ill-health; that he had to leave or die; and his statement to this effect is abundantly corroborated by other witnesses. He was indebted to one Jennings, who clerked for him and had deposited with him $2,400, which he had used in his business, about January, 1876; he settled his debt to Jennings by

transferring him good claims against his debtors for the amount, allowing him twenty per cent. for collecting. He offered his stock of goods for sale to several parties, and finally closed a trade with Hodde & Werner for it, on the basis of a discount of forty per cent. on eastern cost, payable in their notes for $1,641, due 1st January, 1877, and another for $948, due 1st July, 1877. The sale was made openly and publicly without any effort at concealment. While the goods were being delivered and before they were paid for, Basset & Basset, to whom he was indebted for borrowed money, paying two per cent. interest, and who had a judgment by confession for the amount as well as some collateral securities, took out execution on their judgment, and, with the sheriff, proceeded to have a levy made upon the goods. This debt was then settled by transferring to them one of the Hodde & Werner notes and a note on Curry, and the sale to Hodde & Werner was completed. They rejected a small lot of damaged goods worth some $400. That the sale was a fair one and the price a full one, considering that the stock was an old one, is amply proved by Werner and Hodde and other witnesses.

On the 10th August, 1876, Daniel executed to Swearingen the trust deed already mentioned, and that deed was recorded the same day.

. The assets scheduled, including the collaterals Basset held, were turned over to Swearingen. The goods sold to Hodde & Werner, and these assets, were all the property Daniel had subject to execution, except the remnant of goods, which Daniel proceeded to sell as he could, and with the proceeds he received not more than $200; he paid a debt to his cook of $125 for money of hers deposited with him, and some other small debts, and delivered what remained to Swearingen.

He retained a note on one ——, which he swears was really his wife's property, being for a horse and buggy belonging to her. This note he delivered to Swearingen to collect for her, and it is in judgment and uncollected. There was also a small note of $18, "a private note," which he retained. Daniel swears that his assignment to Swearingen was of

all his property except the amounts mentioned and his homestead; that the balance of the proceeds, remnant of goods sold by him, which amounted to some $200 or $250, after paying his cook and some small debts, he used in paying his way to St. Louis, and board for two weeks after he got there; that he did not leave his wife $5 to live on while he was away. She had to sell furniture out of the house to get something to live on.

Among the list of debts in Daniel's schedule is one to Con Hargodine, St. Louis, and one to Edward J. Gay, New Orleans, for $4,500. It was admitted that Hargodine and Gay were relatives of Daniel, and he testifies that the Gay debt, which was his largest debt, was in notes of C. M. & P. Daniel, given in 1870. In answer to a cross-interrogatory put by plaintiff respecting his schedule of debts, he says the credits have all been entered correctly. The debt to plaintiff and the Cannon & Williams debt are included in the list.

The testimony of Daniel as to his motives in selling out, and denial of all fraudulent intent, is full and direct. He says that he offered to pay Hendley & Co. in claims, as he had paid Jennings, but it was not accepted. That but for his ill health he could have continued in business, for that Gay would not push him and that he could have deferred the Basset debt.

Gay was understood to have been the backer of the firm of C. M. & P. M. Daniel, and of P. M. Daniel.

The Hendley judgment, the garnishee's answer, the deed of assignment with its schedule of debts and assets, were read upon the trial.

We have given a full compendium of the testimony, and have omitted no circumstance which could properly affect the issues involved.

Does then this testimony support the judgment rendered?

It is not contended that the deed of assignment from Daniel to Swearingen is void and fraudulent upon its face. It was such a conveyance as was lawful for Daniel to make. It was absolute as regarded him; it contained no reservation

for his benefit, nor stipulation binding upon his creditors. Their rights and his liabilities continued the same as well after as before its execution.

If the deed is invalid, then, it must be because it is in violation of the statute, "made and contrived of malice, fraud, covin, collusion or guile, to the intent or purpose to delay, hinder or defraud creditors."

To avoid it upon these grounds it is essential to establish a fraudulent intent in Daniel. Not alone that creditors may be delayed in the collection of their demand against him, for that may be incidentally the result of any transfer of property by one who is indebted, however fair and honest the transaction may be. It is the fraudulent purpose only which will justify the courts in setting it aside. And fraud is a fact which, like any other fact, must be proven by competent testimony. Mere surmises, for they may be visionary, nor suspicions, for they may be unfounded, will be sufficient. Not often, indeed, can the fraudulent intent be proved by direct testimony, for fraud seeks concealment, but because the proof may be difficult it is not the less essential. And there may be facts and circumstances surrounding the fraudulent transaction which, given in evidence, may expose its true character as clearly as the most direct testimony. Are such disclosed by the proof in this case? We will consider the objections to the validity of the deed pointed out by the plaintiff as tending to show the fraudulent intent of Daniel in making it, somewhat in the order they are presented, passing over those which are immaterial.

It is objected:

1. That Daniel was in failing circumstances and secretly transferred $2,400 in accounts to Jennings in payment of a debt due him. The answer to this is that a debtor, though in failing circumstances, has the legal right, if done *bona fide*, to prefer creditors; and the secrecy of this transaction is not shown, or that any secret was made of it. In fact it would seem that a like offer was made to Hendley & Co. for the discharge of their debt.

2. That the sale of his goods to Hodde & Werner was se-

cretly made and not for full value. This proposition is not supported by the proof. Appellee says the sale was as "privately made as its nature permitted," and we add as publicly. More parade and notoriety of set purpose given to it would of itself have been a circumstance of suspicion. And all the witnesses show that the price was a full one.

3. That after the sale to Hodde & Werner Daniel retailed the rest of the goods, save a few worthless remnants, at such price as he could get in cash, and used the proceeds in paying a debt to his cook, as he says, in buying provisions for his family, in paying his way to St. Louis and in supporting himself two weeks after he got there. This was no more than Daniel had a legal right to do. It was rather commendable than otherwise that he paid this debt, and the testimony shows that it took very little to support him. He had, as yet, made no assignment, and it will be observed that although in fact he did assign, with the exception of a very trifling sum, all his property for the payment of his debts, the assignment does not purport to convey all, but the assets conveyed are specifically designated in his schedule. The reservation of these trifling amounts are no indication of fraud.

4. That the claims transferred were most of them worthless, and the land was not properly conveyed. The answer to this is, it is shown that the claims were, with a trifling exception, all he had, and that if the land did not pass by the deed to the assignee, it is subject to Hendley & Co.'s judgment, of which surely they cannot complain.

5. That the creditors named in the assignment did not accept, nor has the assignee any evidence of the validity of their claims.

The law presumes the acceptance by the creditors of an assignment made for their benefit, and this deed imposed no terms upon them. 22 Tex., 708. And the fact of the existence of Daniel's indebtedness was sufficiently proven. His testimony showing his indebtedness on the C. & M. Daniel notes given to Gay, and that all credits were properly entered, to which he was entitled as against the creditors

named in the list, was sufficient proof in the position of the case. The garnishee's answer stood for proof until rebutted. The plaintiff alleged that the creditors named were fictitious, and it was for him to introduce some proof to throw doubt or suspicion of fraud upon the assignment before the garnishee could be called upon to make further proof.

6. The list of creditors in the schedule shows the names of Con Hargodine and Ed. J. Gay, as holding more than one-half the claims against Daniel. These men are all relatives of Daniel. E. J. Gay was not only a relative, but was also the "backer" of the successive firms of McCreery & Co., and C. M. & P. M. Daniel. It is also objected that the debt to Gay was barred by limitation.

Now Daniels was not bound to plead the statutes of limitation, nor is it shown that he could have done so successfully, and assuredly neither in law nor in morals was the obligation upon him less binding to pay his honest debts, because they were due and owing to a kinsman, a friend and an indulgent creditor.

7. Partnership creditors have the right to be satisfied out of partnership assets before individual creditors can come in, and, likewise, individual creditors have the same right to preference in the distribution of individual assets. And from this proposition plaintiff contends that the notes of C. & M. Daniel were not good, against the assets in the hands of the garnishee, until the individual creditors were paid.

But this is not the law. Cox v. Miller, 4 L. J., 146; Higgins v. Rector, 47 Tex., 361. And if it were, it is not easy to perceive how the inclusion of that claim, for which P. M. Daniel was liable, in the list of his debts, could be construed into an evidence of fraud in the assignment.

Finally, the plaintiff objects that Daniel is not a very credible witness; but he is in the main facts corroborated by other witnesses, and by no witness or fact discredited. Mr. Ben. Basset's belief "that he was not at all times reliable in his statements," tends in no way to impeach his credibility under oath.

In none, then, of these objections which we have considered

separately do we find the proof of fraud, and they can acquire no taint of it from grouping them together. Each circumstance is in itself perfectly consistent with the existence of an honest intent in the mind of Daniel, and, taken all together, they cannot be tortured into proof of fraud, malice, covin and deceit.

The doctrine of the law upon this general subject of fraudulent conveyances to defeat creditors is nowhere better laid down than by Mr. Justice Roberts in Baldwin *v.* Peet, 22 Tex., 717, and we cite that case in support of the conclusions we have reached in discussing the points made by the appellee.

"If the purpose in executing a deed of assignment is to pay honest debts, either by general distribution or by exercising a preference among creditors, it will be valid. In the language of a very great judge (Gaston, J.), every conveyance of property by an insolvent or embarrassed man, to the exclusive satisfaction of the claims of some of his creditors, has necessarily a tendency to defeat or hinder his other creditors in the collection of their demands. But if the sole purpose of such conveyance be the discharge of an honest debt, it does not fall under the operation of the statute of frauds.

"Courts of equity regard with favor the fair and just motives of a failing debtor in the equal distribution of his effects by an assignment of all his property, even though its effects may necessarily be, and must be foreseen to be, to hinder or delay a vigilant or pressing creditor; and it can readily be conceived that this motive, as well as that of preferring some favorite creditors may and often does rise above any mere desire to thwart the urgent pursuit of any one or more creditors."

These observations apply with peculiar aptness to the circumstances of this case. That Daniel, in failing circumstances, in failing health, under the necessity of a change of climate for the preservation of his life and the restoration, if possible, of his health, should take measures for the settlement of his affairs and closing of his business at Brenham,

and distribution of his effects *pro rata* among his creditors, concealing nothing, reserving nothing, preferring those who had deposited their money with him, discharging the Basset debt, which bore such a rate of interest as if suffered to accumulate would absorb all his assets, and the collection of which by execution sale was imminent, stinting himself and his family of even the necessaries of life,— that these acts are but the legitimate offspring of a malicious intent to defraud his creditors is utterly irreconcilable with any just rule for judging of human nature or conduct. Indeed, reviewing all the testimony, we are impressed with the conviction that Daniel's conduct was that of a man sincerely desirous of doing equity among his creditors, and that the assignment made by him was neither inequitable nor fraudulent.

The remaining assignment of error requires no extended notice. We do not think the court erred in refusing a new trial to make parties. In this suit Swearingen took upon his own shoulders the burthen of the contention. He did not ask that parties should be made until after he had been worsted in the controversy, and it was then too late to avail himself of this objection, or to demand that relief for which he had failed to ask. As the case will be reversed, he can upon another trial, if he deems it necessary for his protection, have the proper parties made, or the creditors can intervene for the assertion of their own rights.

It may be proper to remark that the judgment rendered, supposing the recitals in it to be correct, is not one which the court should have rendered. It is manifestly inconsistent to set aside the deed of trust as to Hendley & Co., and yet hold Swearingen as their trustee, and decree his execution of the trust for their benefit. If the deed was annulled, the garnishment was not binding upon the choses in action in Swearingen's hands, for these are not liable to garnishment.

Because the judgment of the court is not supported by the evidence, we are of opinion that it is erroneous and should be reversed, and so award.

REVERSED AND REMANDED.